NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |  |
|---|---|---|
| WILLIAM J. STAHL, et al., | : | Civil Action No. 15-361 (SRC) |
| | : | |
| Plaintiffs, | : | **OPINION** |
| | : | |
| v. | : | |
| | : | |
| BAUER AUTOMOTIVE, INC., et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |

**CHESLER**, District Judge

This matter comes before the Court on Plaintiffs' motion for partial summary judgment and on Defendants' cross-motion for summary judgment. The motions have been fully briefed, and the Court has reviewed the papers filed by the parties. It proceeds to rule on the motion without oral argument, pursuant to Federal Rule of Civil Procedure 78. For the reasons that follow, Plaintiffs' motion for partial summary judgment will be denied, Defendants' motion for summary judgment will be granted in part, and the remainder of this action will be dismissed without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

I.      **BACKGROUND**

This is an action for recovery of environmental remediation costs brought under the Comprehensive Environmental Response Compensation and Liability Act of 1980, 42 U.S.C. § 9601, et seq. (hereinafter "CERCLA"). The cleanup costs at issue relate to property consisting of two adjacent parcels of land located at 2-12 River Road in the Borough of Chatham, New Jersey

1

and owned at all relevant times by National Manufacturing Company ("NMC"). The subject property will hereinafter be referred to as the "NMC Site." Plaintiffs William J. Stahl, the Estate of Otto Stahl, Jr., Richard P. Stahl and Karl Heilig (collectively, "Plaintiffs" or "the Stahls") are individuals who owned all outstanding shares of NMC until July 15, 1997. Defendants George Bauer and Kathryn Bauer ("the Bauers") own a parcel of real property located at 27 Watchung Avenue in the Borough of Chatham, New Jersey. The Bauers' parcel will hereinafter be referred to as the "Bauer Property." Defendant Bauer Automotive has, since 1975, operated a truck repair shop on the Bauer Property. The Bauer Property is adjacent to the NMC Site.

Plaintiffs' CERCLA and related state law claims center on the environmental contamination detected at a location on the NMC Site in and around monitoring well MW-4R. The gravamen of the action is that the contamination in the MW-4R area resulted from the migration of hazardous substances allegedly discharged by Defendants on the adjacent Bauer Property. Plaintiffs maintain that Defendants are responsible for the contamination of the NMC Site in the MW-4R area and are therefore liable for the cost of remediating that area.

## A. The Stahls' Sale of NMC in 1997

NMC was founded in 1952 by Otto Stahl, Sr., who later transferred ownership to his sons and a nephew, the individuals this Opinion refers to collectively as the Stahls. NMC was at all relevant times engaged in the manufacture of metal parts for industrial uses. According to William Stahl, NMC "manufactured deep drawn metal enclosures, a process that consisted of reshaping raw sheet metal using custom dies . . . and extreme pressure oils." (Stahl Cert., ¶ 17.) He adds that, following this process, "chlorinated solvents were used to remove the extreme pressure oils." (Id., ¶ 18.) Chlorinated solvents, including a material known as Trichloroethylene

("TCE"), were used by NMC in the degreasing process. TCE is classified as a hazardous substance, under federal and New Jersey state law.

It is undisputed that prior to the Stahls' 1997 sale of NMC, TCE was discharged at the NMC Site. An underground storage tank ("UST") had been maintained in the parking lot area of 2 River Road, in and around the area of monitoring well MW-5. The UST was used to store wash water containing TCE. The Stahls concede that environmental contamination found in the MW-5 area resulted from an on-site discharge of TCE.

The Stahls sold NMC on July 15, 1997. On May 28, 1997, they entered into a Stock Purchase Agreement ("SPA") with Waverly Partners for the sale of all the issued and outstanding shares of NMC. In relevant part, the SPA included an indemnification provision, pursuant to which the Stahls agreed to indemnify NMC for any costs NMC incurred to remediate environmental contamination existing at the NMC Site prior to the closing date of the SPA. In Section 10.1(d), the SPA sets forth that the indemnification obligation on the Stahls encompasses damages, liabilities, costs and expenses arising from, specifically:

> Any liability incurred by the Buyer Indemnified Parties, or costs incurred by them, arising out of, or relating to, the actual, alleged, or threatened pre-Closing discharge, disposal, release, spillage, leaking or existence of any Hazardous Materials on, at, under, or flowing on, under or from, (i) any Real Property, and/or (ii) any property presently or formerly owned, leased, operated or used by the Company (whether or not the Company knew at the time such properties were being used for such purposes) for the transportation, treatment, storage, handling or disposal or Hazardous Materials. The Stockholders' obligations under this subsection (d) shall exist whether the contamination is discovered pre-Closing or post-Closing.

(Stahl Cert., Ex. A: SPA § 10.1(d)).

Pursuant to the SPA, and as required by the New Jersey Industrial Site Recovery Act ("ISRA"), the contemplated transfer of real property comprising the NMC Site triggered an obligation to assess and clean up environmental contamination on the property. NMC

accordingly conducted two environmental surveys of the NMC Site prior to the closing of the stock sale. The Phase II Environmental Investigation revealed that the soil and/or groundwater at ten different locations on the NMC Site contained hazardous substances, including TCE and other chlorinated solvents.

Notwithstanding the discovery of contamination at the NMC site, the Stahls and the stock purchaser, Waverly Partners, proceeded with the stock sale. Prior to the closing, the Stahls entered into a Supplemental Agreement. The Supplemental Agreement acknowledged the findings of the Phase II Environmental Investigation Report and addressed the issue of ISRA compliance, that is, the legal obligation to remediate the contaminated property. The Supplemental Agreement placed responsibility for cleanup of the NMC Site on NMC, the legal entity which would continue following the stock transfer. The parties agreed that NMC "shall be responsible for initiating and completing all control and cleanup procedures described in the Phase II report and emanating from the Remediation Agreement of July 9, 1997, or as directed by the NJDEP and/or any other State or Federal agency." (Stahl Cert., Ex. B: Supplemental Agreement § 1.03). The Supplemental Agreement further provided that NMC would "be responsible for expending the Remediation Amount, as well as the initiation of whatever legal action(s) that may be necessary in order to ensure that the responsibility for remediation is on those parties identified in the Phase II Report as the persons responsible for the contamination of National-NJ properties." (Id.)

The Stahls and NMC executed the Supplemental Agreement on July 15, 1997. Immediately thereafter, on the same date, the stock purchase transaction closed.

**B. Post-Sale Lawsuit and Arbitration**

Subsequent to the closing, numerous disputes arose between the Stahls and NMC. Many concerned the environmental contamination of the NMC Site. The issues related to, among other matters, the nature and extent of the contamination, the source of the contamination, the remedial measures needed to be taken, the cost of the remediation, which party would bear the cost of remediation and which party had the obligation to pursue damages claims against third parties. The Stahls filed a lawsuit against NMC in the Superior Court of New Jersey to recover certain monies owed, and NMC counterclaimed for, among other things, recovery of amounts it expended for environmental liabilities. NMC claimed that these amounts were owed by the Stahls under their SPA indemnification obligations. It did not, however, assert any CERCLA claims against the Stahls for recovery of remediation costs.

On or about September 25, 2002, the Stahls and NMC settled the New Jersey state court lawsuit by agreeing to submit to binding arbitration. Following numerous hearing dates, witness testimony, and the collection of evidence, an arbitration panel consisting of three retired state court judges issued a final award on or about May 11, 2005 (the "Arbitration Award"). In their Amended Complaint, the Stahls summarize the Arbitration Award's determinations on matters relating to the Stahls' and NMC's respective remediation and payment obligations. The Amended Complaint sets forth as follows:

1. The 2-12 River Road Property is contaminated with at least four hazardous materials, namely, TCE, CIS-12 dichlorethene, tetrachlorethene, and vinylchloride. TCE is the principal contaminant on the site and the evidence supported a finding [that] the TCE contamination occurred on-site and was an aged release that had existed for an extended period of time. The Panel found that the contamination occurred prior to July 15, 1997.

2. The Plaintiffs [the Stahls] were required, pursuant to the environmental indemnification provisions of the Stock Purchase

Agreement, to pay NMC, through offsets of moneys due to them, the sum of $396,089 as reimbursement to NMC for the cost of investigating and remediating environmental contamination incurred through December 31, 2003 with respect to the Properties.

3. Pursuant to the environmental indemnification provisions of the Stock Purchase Agreement, the Plaintiffs were required to indemnify NMC for the costs and expenses NMC actually incurs in investigating and remediating the environmental contamination on the Properties, but NMC may not seek to recovery [sic] such costs and expenses from the Plaintiffs until such time as NMC has, with respect to the Properties, initiated, completed and paid for the remediation in accordance with a plan approved and accepted by the NJDEP.

(Am. Compl., ¶ 16.)

Indeed, the Arbitration Award provided a thorough review of the SPA and Supplemental Agreement, as well as the negotiations leading up to those contracts. It also reached certain conclusions about the relative rights and duties of the parties to those agreements. Of relevance to the lawsuit before this Court, the arbitrators determined that the Stahls had, in consideration of the sale of their stock in NMC, agreed to, among others, the following three things:

One, the Stahls agreed to indemnify NMC for the remediation costs it actually incurs in performing the remediation, as approved by New Jersey Department of Environmental Protection ("NJDEP"). The Arbitration Award states as follows:

In light of these settled principles [of contract interpretation], the PANEL FINDS that the Stahls did not have a contractual obligation to indemnify National [NMC] with respect to National's [ISRA] liabilities,[1] or for any other potential liabilities relating to the environmental remediation of the

_____

[1] The Arbitration Award issued by the arbitrators refers to National's "ERISA" liabilities. Clearly, that acronym – which refers to the federal employment benefits statute known as the Employee Retirement Income Security Act of 1974 – was used in error. The matters at issue before the arbitrators concerned environmental cleanup of the NMC Site, and thus in context, the quoted sentence can be understood to refer to National's liabilities under "ISRA" – New Jersey's Industrial Site Recovery Act, which requires owners of certain industrial sites to investigate and remediate upon property transfers. New Jersey permits parties to shift the obligation for ISRA compliance from seller to buyer. Feighner v. Sauter, 259 N.J. Super. 583, 589-90 (App Div. 1992); Dixon Venture v. J. Dixon Crucible, 235 N.J. Super. 105, 109 (App. Div. 1989) (citing N.J.S.A. 13:1K-9c).

property. The Stahls' contractual obligation was to indemnify National for the cost and expenses actually incurred by National in initiating, completing, and paying for the cleanup of the River Road properties.

* * *

Beyond the language of the agreements [the SPA and Supplemental Agreement] and the construction placed on them by the parties, if there were any doubt that the parties intended that the Stahls would reimburse National for the costs and expenses National incurred in remediating the property, it was resolved by the parties and incorporated in and made part of the Arbitration Agreement. The Arbitration Agreement, in pertinent part, expressly provided:

> Any invoices relating to claims or reimbursement of environmental costs or expenses incurred after October 10, 2002 shall be submitted by the Defendant (National) in due course to Plaintiffs' (Stahl) counsel. Plaintiff shall have 30 days to either agree to said invoices or to notify Defendant's counsel that the Plaintiffs dispute said invoices. Any disputes relating to environmental costs or expenses incurred after October 10, 2002, shall be decided through binding arbitration with the third selected arbitrator or an agreed-upon replacement acting as a sole arbitrator.

(Stahl Cert., Ex. D: Arbitration Award at ¶¶ 69, 71.)

Two, the Stahls agreed to cede any involvement in the performance of remediation

activities at the NMC Site. The arbitrators found that

> As a result of the agreement reached by the parties and memorialized by the execution of the Supplemental Agreement at that meeting, National acquired the exclusive right to initiate, complete, and control the clean-up procedures emanating from the Remediation Agreement or as may be directed by the DEP. The Stahls gave up that right and were excluded from the process even though they were obligated to reimburse National for the costs and expenses it incurred. The PANEL find this to be sufficient consideration for the Supplemental Agreement . . ..

(Id. at ¶ 80.)

Three, the Stahls agreed that any legal action to pursue third parties which may bear responsibility for the NMC Site contamination would be brought by NMC. The Arbitration Award states that

> The Supplemental Agreement does not specifically provide that National is to institute a lawsuit against any party. Rather, it requires National to institute whatever legal action may be necessary to ensure that the responsibility for remediation is on those parties identified in the Phase II report as the persons responsible for the contamination.

(Id. at ¶ 78.)

The foregoing facts are undisputed. Moreover, the Stahls admit for purposes of this motion that, "in accordance with the arbitration award, NMC (through its new owners) conducted the investigation and remediation, and Plaintiffs, who did not participate in conducting the investigation and/or remediation, reimbursed NMC for the cost." (Defs.' Statement of Material Facts ("SOMF") ¶ 16; Pls.' Response to SOMF ¶ 16.)

### C. Remediation of the NMC Site: Contamination at MW-4R and MW-5

NMC retained an environmental consultant, Environmental Liability Management ("ELM"), in connection with the performance of its remediation obligations. According to the Amended Complaint, in 2005 NMC and ELM engaged in a large soil excavation action to remove contaminants at the NMC Site in the MW-5 area, where TCE had admittedly been discharged on-site. ELM also conducted a comprehensive review of information and data collected from the NMC Site and from the Bauer Property during previous investigations, which had been performed at the NJDEP's direction to determine the source of contamination detected on the NMC Site at MW-4R. Soil and ground water samples were collected from temporary monitoring wells installed on the Bauer Property. According to the Stahls, ELM advised that

contamination detected at another location at the NMC Site, the area at monitoring well MW-4R, is "attributable to an off-property source." (Am. Compl., ¶ 26.)

Plaintiffs assert that ELM's investigations and analysis demonstrate that the source of the contamination is the Bauer Property. In a June 18, 2008 letter written by ELM to the NJDEP, ELM reported that "the analytical results for the ground water samples collected from the property located northwest of the National site . . . support the conclusion that a potential source of CVOs [chlorinated volatile organic compounds] is located on the neighboring northwestern property (not owned by National) which is attributable for the constituents detected in National property well MW-4R . . .." (Coffey Cert., Ex. A at 16.) In its February 8, 2011 Remedial Investigation Report, ELM concluded that the off-site source of TCE and other contaminants detected at MW-4R was indicated by the consistent eastern ground water flow together with the results of ground water samples collected from the upgradient adjacent property to the northwest at 27 Watchung Avenue (the Bauer Property). ELM's report stated that "[t]he results, which were previously submitted to the NJDEP, documented that samples collected from the 27 Watchung Avenue property contained significantly greater concentrations of TCE (more than two times) than were found in well MW-4R . . .. Further, the sample collected up gradient of the 27 Watchung Avenue property . . . contained TCE at a concentration (1.5 ug/l) approaching the GWQS [ground water quality standards] for TCE, documenting that this portion of the National property is not the source of the TCE on the 27 Watchung Avenue property." (Coffey Cert., Ex. B at vi.) The report further states that, while multiple lines of evidence indicate that the contamination at MW-4R is due to an off-property source, "multiple lines-of-evidence have eliminated the potential that a source is present at the National property which could be attributable for the CVOs/TCEs being detected in MW-4R." (Id. at x.) Additionally, a May 21,

2013 Remedial Action Report prepared by ELM repeats these conclusions with regard to the source of contamination detected at MW-4R.

In addition to the ELM reports, Plaintiffs rely on the expert report of their civil and environmental engineering expert, Eric Raes, for their theory that Defendants' discharge of volatile organic compounds caused the MW-4R contamination. Raes concludes that "the contaminants detected in the MW-4R area are migrating from the adjacent and upgradient Bauer Automotive Site." (Coffey Cert., Ex. F at 1.) He noted in his report that, since at least 1975, "Bauer Automotive has used and stored a machine parts washer utilizing solvents to clean parts and machines in connection with its auto and truck repair operations." (Id. at 5.) At his deposition, Raes testified while he does not have affirmative evidence that TCE was one of the cleaning solvents used by Bauer Automotive, "[i]t was the industry standard to use TCE and TCA and PCE for parts cleaning until recycling was implemented." ((Provorny Cert., Ex. G: Raes Dep. 36:13-21.) However, Raes admitted that he cannot conclude whether the source of the TCE contamination found at MW-4R originated on the Bauer Property or, alternatively, on a property upgradient from the Bauer Property. (Id. at 24:18-25, 54:2-7.) He also testified that only very limited soil samples have been taken from the Bauer Property and that TCE has not been detected in the samples. (Id. at 25:16-26:13.)

### D. The Stahls' Instant Lawsuit Against Bauer

The Stahls initiated this action in the United States District Court for the District of New Jersey on January 20, 2015, alleging that the Bauer Property is the source of the contamination detected on the NMC Site at MW-4. In particular, the Amended Complaint alleges as follows:

> 44. Given the history of the Bauer Automotive Site as an auto and truck repair facility, it is obvious that business used and stored chlorinated solvents as detected in the MW-4R Area in its auto and truck repair operations.

45. Based upon the information deduced from the extensive soil and ground water sampling and monitoring activities completed at the National Manufacturing Site by National and ELM, the horizontal and vertical delineation of the contaminant plume conducted at the National Manufacturing Site, topographic maps, aerial photos and other related site inspections and investigations, it is obvious that the contaminants detected in the MW-4R Area are migrating from the adjacent and up gradient Bauer Automotive Site.

(Am. Compl., ¶¶ 44-45.) In sum, the Stahls assert that the Bauers and Bauer Automotive are responsible for the contamination at MW-4R based on the nature of the business operations at the Bauer Property, its relative topography (upgradient of the NMC Site), the flow of groundwater, and the soil and groundwater samples collected from both the NMC Site and the Bauer Property. The Amended Complaint further avers that as a result of the migration of hazardous substances from the Bauer Property to the NMC Site and the Bauers' role in allegedly causing that contamination, the Stahls "have incurred and will continue to incur costs associated with the investigation and remediation of contaminated soils and groundwater at the [NMC] Site." (Id. ¶ 48.)

The Stahls seek to recover those costs from Defendants under CERCLA and a number of New Jersey statutory and common law theories of relief. The Amended Complaint pleads the following claims:

Count I: CERCLA § 107

Count II: CERCLA § 113

Count III: New Jersey Spill Act

Count IV: Declaratory Judgment

Count V: Strict Liability

Count VI: Restitution

Count VII: Contribution

Count VIII: Common Law Indemnification

Count IX: Public Nuisance

Count X: Negligence

Plaintiffs now move for summary judgment as to their CERCLA § 107 claim only, and Defendants cross-move for summary judgment as to all claims in the Amended Complaint. This Court has subject matter jurisdiction over the action pursuant to 28 U.S.C. § 1331.

## II.   DISCUSSION

### A.  Legal Standard

The parties' cross-motions for summary judgment are governed by Federal Rule of Civil Procedure 56. Rule 56(a) provides that a "court shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986) (construing the similarly worded Rule 56(c), predecessor to the current summary judgment standard set forth in Rule 56(a)). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, a district court "must view the evidence 'in the light most favorable to the opposing party.'" Tolan v. Cotton, 134 S. Ct. 1861, 1866 (2014) (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970)). It may not make credibility determinations or engage in any weighing of the evidence. Anderson, 477 U.S. at 255; see also Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (holding same).

Once the moving party has satisfied its initial burden, the nonmoving party must establish the existence of a genuine issue as to a material fact in order to defeat the motion. Jersey Cent. Power & Light Co. v. Lacey Twp., 772 F.2d 1103, 1109 (3d Cir. 1985). To create a genuine

issue of material fact, the nonmoving party must come forward with sufficient evidence to allow a jury to find in its favor at trial. Gleason v. Norwest Mortg., Inc., 243 F.3d 130, 138 (3d Cir. 2001), overruled on other grounds by Ray Haluch Gravel Co. v. Cent. Pension Fund of the Int'l Union of Operating Eng'rs and Participating Emp'rs, 134 S. Ct. 773 (2014). The party opposing a motion for summary judgment cannot rest on mere allegations; instead, it must present actual evidence that creates a genuine issue as to a material fact for trial. Anderson, 477 U.S. at 248; see also Schoch v. First Fid. Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990) (holding that "unsupported allegations in [a] memorandum and pleadings are insufficient to repel summary judgment"). Indeed, Rule 56(c)(1) expressly requires a party who asserts that a fact is genuinely disputed to support that assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). If the non-movant fails to "properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2).

In the District of New Jersey, moreover, Local Civil Rule 56.1 imposes an additional requirement on both movants and non-movants related to summary judgment motions. The party moving for summary judgment must file a statement which lists, in separately numbered paragraphs, material facts the movant asserts are not in dispute, with citations to the specific portions of the record supporting those factual assertions. In turn, the party opposing summary judgment "shall furnish, with its opposition papers, a responsive statement of material facts,

addressing each paragraph of the movant's statement, indicating agreement or disagreement and, if not agreed, stating each material fact in dispute and citing to the affidavits and other documents submitted in connection with the motion." L. Civ. R. 56.1(a). Indeed, the local rule warns that "any material fact not disputed [in such a responsive statement] shall be deemed undisputed for purposes of the summary judgment motion." Id.

### B. CERCLA § 107 Claim

CERCLA § 107 allows a private party, including a "potentially responsible party" ("PRP"), to recover expenses it has incurred in cleaning up contaminated sites. 42 U.S.C. § 9607(a); United States v. Atl. Research Corp., 551 U.S. 128, 131 (2007). To establish liability under § 107, a plaintiff must prove the following elements:

> (1) that hazardous substances were disposed of at a "facility"; (2) that there has been a "release" or "threatened release" of hazardous substances from the facility into the environment; (3) that the release or threatened release has required or will require the expenditure of "response costs"; and (4) that the defendant falls within one of four categories of responsible parties.

United States v. CDMG Realty Co., 96 F.3d 706, 712 (3d Cir. 1996) (citing 42 U.S.C. § 9607(a)). Section 107(a) lists the four classes of people liable for response costs: the facility's current owner or operator; any person who owned or operated the facility "at the time of disposal" of a hazardous substance; one who arranged for disposal or arranged for transport for disposal of a hazardous substance; and one who accepts hazardous substances for transport. 42 U.S.C. § 9607(a)(1)-(4).

Emphasizing the cost-recovery remedy of CERCLA § 107, the Supreme Court has distinguished this provision from the statute's other avenue of relief, CERLCA § 113, which provides a contribution claim. Atl. Research, 551 U.S. at 138-39. Section 113 "authorizes a PRP to seek contribution [from other PRPs] 'during or following' a suit under § 106 or § 107(a)." Id.

at 138. In contrast, relief under CERLCA § 107 is available to those parties which have "incurred" their own costs in cleaning up a site. Id. at 139. The Supreme Court made clear in Atlantic Research that a party that reimburses another for the response costs that the other party paid in the first instance does not "incur its own costs of response" and therefore does not have a right to seek recovery under § 107. Id. The Court held:

> And § 107(a) permits cost recovery (as distinct from contribution) by a private party that has itself incurred cleanup costs. Hence, a PRP that pays money to satisfy a settlement agreement or a court judgment may pursue § 113(f) contribution. But by reimbursing response costs paid by other parties, the PRP has not incurred its own costs of response and therefore cannot recover under § 107(a).

Id. at 139.

The Bauers argue in their cross-motion for summary judgment that the Stahls lack standing to pursue their § 107(a) claim to recover response costs from Defendants because Plaintiffs did not incur their own remediation costs but rather reimbursed NMC for the expenses it paid in connection with its cleanup of the NMC Site. The Stahls do not dispute that NMC performed the remediation and that they themselves did not participate in the cleanup of the NMC Site. Nor do the Stahls dispute that they reimbursed NMC for expenses incurred by NMC in connection with the cleanup. The Stahls' admitted reimbursement of response costs initially paid by others would appear to place them outside the purview of those parties which may avail themselves of § 107's cost-recovery mechanism. Nevertheless, the Stahls argue that denying them the right to proceed under § 107 simply because of the manner in which the payment of response costs was structured would constitute a hyper-technical application of CERCLA § 107. Instead, the Stahls maintain, the Court should recognize that, by virtue of their agreement to indemnify NMC for remediation costs, the Stahls in essence "incurred" the costs of cleaning up the NMC Site and thus have standing to recover under § 107.

The only authority cited by the Stahls in support of their argument is Agere Systems Inc. v. Advanced Environmental Technology Corporation, 602 F.3d 204 (3d Cir. 2010), in which the Third Circuit found that two PRPs, which had paid response costs pursuant to a settlement agreement with other plaintiffs, had incurred cleanup costs within the meaning of CERCLA § 107. Id. at 225. The facts on which the Third Circuit's decision was based differ significantly, however, from the Stahls' circumstances. Agere was a cost-recovery suit brought under CERCLA § 107(a) and the Pennsylvania environmental remediation statute by five plaintiffs: Agere, Cytec, Ford, SPS and TI.[2] Id. at 210. Four of those plaintiffs had been sued by the EPA, resulting in two consent decrees for cleanup of the contaminated site at issue. Id. at 212-13. Plaintiffs Cytec, Ford and SPS entered into the "OU-1 Consent Decree," and then entered into a settlement agreement with Agere, TI and others "whereby they all agreed to collectively fund and perform OU-1 work and to otherwise comply with the OU-1 Consent Decree." Id. at 212. Thereafter, and in a similar fashion, plaintiffs Cytec, Ford, SPS and TI entered into the "OU-2 Consent Decree" and then entered into a separate, private settlement agreement with Agere "to collectively fund and perform the OU-2 work and to otherwise comply with the OU-2 Consent Decree." Id. at 213. Summarizing the arrangement to pay for and perform the remediation, the Court of Appeals noted that the parties to both settlement agreements "contributed to group trust accounts from which they paid and will continue to pay various contractors to perform the work required" by the consent decrees. Id.

One of the issues on appeal in Agere concerned the district court's holding that Agere and TI had the right to assert § 107(a) cost recovery claims for the amount they paid pursuant to the settlement agreements. Id. at 224-25. The appellant argued that, under the Supreme Court's

---

[2] The Court has identified the Agere plaintiffs for clarity but has adopted the shorthand used by Third Circuit in its opinion for brevity.

holding in <u>Atlantic Research</u>, Agere and TI had not incurred response costs by paying into group

trust accounts because they did so only to "satisfy a settlement agreement." <u>Id.</u> at 225. The Third

Circuit rejected this argument and affirmed the district court's ruling. <u>Id.</u> The Court of Appeals

reasoned as follows:

> We do not think the Supreme Court intended to deprive the word
> "incurred" of its ordinary meaning. Agere and TI put their money in the
> pot right along with the money from the signers of the consent decrees.
> The costs they paid for were incurred at the same time as the costs
> incurred by the signers of the consent decrees and for the same work.
> Those costs were incurred in the ordinary sense that a bill one obligates
> oneself to pay comes due as the job gets done. While the Supreme Court
> in *Atlantic Research* did hold that § 107(a) permits a PRP to recover only
> costs it has "incurred," and did suggest that costs paid pursuant to a
> settlement agreement are not such costs, those statements were not made
> in the context of payments made for on-going work.

<u>Id.</u> The <u>Agere</u> court further reasoned that <u>Atlantic Research</u>'s exclusion of settlement payments

from the scope of costs incurred, within the meaning of § 107(a), appeared to be based on the

availability of relief under CERCLA § 113, the provision authorizing a contribution claim. <u>Id.</u>

Plaintiffs Agere and TI, however, would be barred from a contribution claim, the court noted,

because they had not themselves been subject to a civil action under CERCLA, as the Supreme

Court previously held was required to bring a § 113 claim. <u>Id.</u> (citing <u>Cooper Indus. v. Aviall</u>

<u>Servs.</u>, 543 U.S. 157, 168 (2004)). The <u>Agere</u> court concluded that barring recovery for "all

PRPs who, like Agere and TI, agree to come forward and assist in a cleanup even though they

have not been subjected to a cost recovery suit" would penalize cooperative cleanup and thus run

counter to the goal of CERCLA. <u>Id.</u> at 226.

This Court recognizes the broad similarities between the Stahls and the "settlement

agreement" parties in <u>Agere</u>. Like Agere and TI, the Stahls have not been subjected to a

CERCLA § 107(a) cost recovery suit but do bear a contractual obligation to pay remediation

costs. That, however, is where the similarities end. Agere and TI voluntarily undertook the

remediation of a contaminated site in a joint endeavor with other PRPs. They assumed

responsibility for the cleanup as it was occurring and funded the cleanup through a trust account

they and other PRPs maintained for the contemporaneous payment of remediation costs as they

arose. In every practical sense, Agere and TI acted as co-remediators. In light of these facts, the

Third Circuit concluded that the formality of creating the joint endeavor through a private

"settlement agreement" should not bar Agere and TI from proceeding to recover costs under §

107, based on a hyper-technical application of a statement made by the Supreme Court in

Atlantic Research. In contrast, the Stahls did not assume any obligation to remediate the NMC

Site, did not participate in the cleanup (either directly or indirectly) and did not pay response

costs as the bills for remediation work became due. The Stahls owned contaminated property and

wished to sell it, as part of their sale of all their shares in NMC, triggering their obligation to

remediate under New Jersey statutory law. The Stahls transferred their cleanup obligation to the

purchaser of the stock, that is, to the "new" NMC, but, in consideration of the stock sale, also

agreed to indemnify NMC for remediation expenses. The Stahls' indemnity agreement ran only

to the expenses of remediation performed NMC, with no involvement by the Stahls. Indeed, the

indemnification provision of the SPA as well as the Supplemental Agreement they signed

expressly provides that NMC would be "responsible for initiating and completing all control and

cleanup" of the NMC Site. Moreover, there is no indication that the Stahls contemporaneously

paid for ongoing remediation work, directly assuming the cleanup costs as the bills became due.

Nor is there any indication that they established a trust or escrow account from which NMC

could draw to pay response costs. Rather, the Supplemental Agreement expressly states that

NMC would be responsible "for expending the Remediation Amount." Indeed, according to the

Arbitration Award, NMC and the Stahls established a reimbursement process, in which the Stahls are given time to review the invoices submitted by NMC for the cleanup expenses and an opportunity to dispute the invoices.[3] In short, the entire structure of the arrangement to which the Stahls agreed positions them, in both form and substance, as a payor of response costs *incurred by another party*—not as a joint remediator. The Stahls' circumstances are simply are not analogous to those presented in <u>Agere</u>, and the Court finds that decision in apposite to the case at bar.

Atlantic Research, binding on this Court, holds that a CERCLA § 107(a) claim for cost recovery is available to "a private party *that has itself incurred* cleanup costs." <u>Atl. Research</u>, 551 U.S. at 139 (emphasis added). In so holding, the Supreme Court made clear that "by reimbursing response costs paid by other parties, the PRP has not incurred its own costs of response and therefore cannot recover under § 107(a)." <u>Id.</u> The uncontroverted facts in this case establish that the Stahls reimbursed NMC for response costs related to the NMC Site. Because they did not incur the costs of cleaning up the NMC Site, the Stahls cannot recover under CERCLA § 107.

Accordingly, the Stahls' motion for partial summary judgment on the CERCLA § 107(a) claim will be denied, and summary judgment will be granted in Defendants' favor on this claim.

---

[3] While the Stahls agreed to remain responsible for the cost of remediation, there is no indication that they negotiated an assignment of § 107 rights running to the party which incurs the environmental response costs, that is, NMC. To the contrary, the Supplemental Agreement expressly recognizes that any lawsuit for recovery of costs from other PRPs would be filed, if at all, by NMC.

### C. CERLCA § 113 Claim

CERLCA § 113(f) authorizes an action for contribution "during or following any civil action any civil action under section 9606 of this title or under section 9607(a) of this title." 42 U.S.C. § 9613(f)(1). As noted above, the Supreme Court has held that "a private party who has not been sued under [CERCLA] § 106 or 107(a)" may not assert a contribution claim under § 113(f). Cooper Indus. v. Aviall Servs., 543 U.S. 157, 161 (2004); see also Agere, 602 F.3d at 225 (citing Cooper as "explaining that § 113(f) authorizes contribution claims only for PRPs who have been subject to a civil action under CERCLA"). Defendants argue that because there is no dispute that Plaintiffs have not been sued under CERCLA § 106 or § 107(a), Plaintiffs lack standing to pursue a § 113 claim and summary judgment should therefore be granted. Defendants are correct.

Additionally, it appears that in failing to oppose Defendants' cross-motion as it pertains to the CERCLA § 113 claim, Plaintiffs have abandoned the claim. "District courts in and out of this Circuit routinely deem abandoned a party's claim when that party fails to present any opposition to a motion for summary judgment." See Samoles v. Lacey Twp., 12-cv-3066, 2014 U.S. Dist. LEXIS 79211, 2014 WL 2602251, at *4 n.8 (D.N.J. June 11, 2014) (collecting cases); cf. Reynolds v. Wagner, 128 F.3d 166, 178 (3d Cir. 1997) (stating, in the context of an appeal from a district court's decision, that "an argument consisting of no more than a conclusory assertion such as the one made here (without even a citation to the record) will be deemed waived.")

Accordingly, summary judgment will be granted in Defendants' favor as to Plaintiffs' claim under CERCLA § 113.[4]

### D. New Jersey State Law Claims

Defendants also seek summary judgment as to all the state law causes of action pled in the Amended Complaint. The Court notes that Plaintiffs have failed to oppose the motion as to all the state law claims except Count III for relief under the New Jersey Spill Act, <u>N.J.S.A.</u> 58:10-23.11f(a)(2). However, pursuant to its discretion under 28 U.S.C. § 1367, the Court will not reach this portion of Defendants' motion and will instead dismiss the state law claims without prejudice.

Thus far, the Court had exercised supplemental jurisdiction over Plaintiffs' state law causes of action, including the Spill Act claim, pursuant to 28 U.S.C. § 1367(a), on the basis that the state claims were "so related" to the federal CERCLA claims, on which the Court's original jurisdiction was predicated, that they formed part of the same case or controversy. The Court's grant of summary judgment for the Defendants on the CERCLA claims, however, disposes of the claims on which the Court's original jurisdiction is based.

Under 28 U.S.C. § 1367(c)(3), a district court may decline to exercise supplemental jurisdiction if "the district court has dismissed all claims over which it has original jurisdiction." The Supreme Court has held that once federal claims are dismissed, a federal court should "hesitate to exercise jurisdiction over state claims," unless circumstances justify this exercise. <u>United Mine Workers v. Gibbs</u>, 383 U.S. 715, 726 (1966); <u>see also</u> <u>New Rock Asset Partners,</u>

---

[4] The Court recognizes that this result leaves the Stahls without a CERCLA remedy. While the Supreme Court has observed that CERCLA "defines PRPs so broadly as to sweep in virtually all persons likely to incur cleanup costs," <u>Atlantic Research</u>, 551 U.S. at 136, it has also delineated limits on the parties that may sue under § 107 or § 113. The Stahls simply cannot be shoehorned into the statute's remedial scheme.

<u>L.P. v. Preferred Entity Advancements</u>, 101 F.3d 1492, 1504 (3d Cir. 1996) ("once all federal claims have been dropped from a case, the case simply does not belong in federal court."). The Court concludes that its continuing exercise of jurisdiction over the New Jersey Spill Act claim and the various causes of action under New Jersey common law would not be appropriate. In its discretion, pursuant to 28 U.S.C. § 1367(c)(3), the Court declines to exercise supplemental jurisdiction over the remaining state law claims.

The Court will accordingly dismiss Plaintiffs' state law claims without prejudice, so that they may be re-filed in the Superior Court of New Jersey, within the thirty-day time period provided by 28 U.S.C. § 1367(d).


### III.    CONCLUSION

For the reasons set forth above, Defendants have demonstrated that they are entitled to summary judgment on Plaintiffs' claims under CERCLA § 107 and § 113, pursuant to Federal Rule of Civil Procedure 56(a). Their motion for summary judgment on those claims will be granted, and Plaintiffs' motion for summary judgment will be denied. The remaining state law claims will be dismissed without prejudice pursuant to 28 U.S.C. § 1367(c)(3). An appropriate Order will be filed.

   s/ Stanley R. Chesler   
STANLEY R. CHESLER
United States District Judge

Dated:  August 7, 2019